**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| Jane Doe (DJK), an individual<br><br>*Plaintiff,*<br><br>v.<br><br>G6 HOSPITALITY, LLC,<br>G6 HOSPITALITY IP, LLC,<br>G6 HOSPITALITY PROPERTY, LLC,<br>G6 HOSPITALITY PURCHASING, LLC,<br>G6 HOSPITALITY FRANCHISING, LLC,<br>MOTEL 6 OPERATING, L.P.<br><br>*Defendants.* | CIVIL ACTION NO. 1:25-cv-00244<br>Related Case: 1:23-cv-00269 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW Plaintiff Jane Doe (DJK), by and through the undersigned counsel, and respectfully submits her Original Complaint for damages.

**SUMMARY**

1. Jane Doe (DJK) is a survivor of sex trafficking. Jane Doe (DJK)'s trafficker trafficked Jane Doe (DJK) at the Motel 6 located at 200 N. Lincoln Avenue, Corona, CA 92882.

2. The Motel 6 at 200 N. Lincoln Avenue, Corona, CA 92882 ("Corona") was jointly operated by G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, Motel 6 Operating, L.P. (collectively "G6 Defendants" or "G6"). G6 was the "boots on the ground" operator of the Corona Motel 6 and controlled all aspects of the operation at this hotel.

3. As discussed herein, G6 derived a financial benefit from widespread use of the Corona Motel 6 for sex trafficking, including the trafficking of Jane Doe (DJK). Despite obvious and apparent signs of sex trafficking at the Corona Motel 6, G6 continued renting hotel rooms to

Jane Doe (DJK)'s trafficker and operated the Corona Motel 6 in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

4. Jane Doe (DJK) files this civil lawsuit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*, for the harms and losses she suffered because of the sex trafficking she endured at the Corona Motel 6, which G6 benefited from and facilitated.

**PARTIES**

5. Jane Doe (DJK) is a natural person who is currently a resident and citizen of California. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of Jane Doe (DJK).

6. Defendant G6 Hospitality LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

7. Defendant G6 Hospitality IP, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

8. Defendant G6 Hospitality Property, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

9. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

10. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

11. Defendant Motel 6 Operating, LP is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

12. Defendants G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP will collectively be referred to as "G6 or "G6 Defendants. Upon information or belief, they operated, controlled and directly managed the Motel 6 at 200 N. Lincoln Avenue, Corona, CA 92882.

## JURISDICTION AND VENUE

13. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and all Defendants are residents of Texas.

15. G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP have the same principal place of business, which is in Carrolton, Texas, within the Eastern District of Texas. Therefore, each is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

16. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District

of Texas.

17. Each of the G6 Defendants participated in a joint venture operating Motel 6 from a central location at the G6 corporate offices in Carrolton, Texas, within the Eastern District of Texas. On information and belief:

- The relationship between the G6 Defendants was centered at the G6 corporate offices in the Eastern District of Texas
- The G6 Defendants signed agreements with one another related to the Corona Motel 6 from G6 corporate offices in the Eastern District of Texas.
- The G6 Defendants exercised joint control over operations of the Corona Motel 6 from a central location at G6 corporate offices in the Eastern District of Texas.
- The G6 Defendants distributed revenue earned from the Corona Motel 6 among themselves from G6 corporate offices in the Eastern District of Texas.
- The G6 Defendants developed policies for the Corona Motel 6 from G6 corporate offices in the Eastern District of Texas.
- The G6 Defendants communicated with one another regarding operation of the Corona Motel 6 from G6 corporate offices in the Eastern District of Texas.

## SEX TRAFFICKING AND THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

18. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

19. In 2008, Congress, through the TVPRA, expanded the remedies available to survivors of sex trafficking. In so doing, it recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—benefit from participation in ventures that facilitate sex trafficking.

20. In the TVPRA, Congress adopted a broad definition of sex trafficking to "address the increasingly subtle methods of traffickers who place their victims in modern-day slavery."[1]

21. The TVPRA defines sex trafficking as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[2]

22. Fraud includes any "deliberate act of deception, trickery or misrepresentation."[3]

23. Coercion includes "threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or the legal process."[4]

24. Serious harm refers to "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."[5]

25. Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[6] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[7]

---

[1] H.R. REP. NO. 106-939, at 101; 18 U.S.C. § 1591(e)(5).
[2] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[3] *United States v. Bell*, 761 F.3d 900, 909 (8th Cir. 2014)
[4] 18 U.S.C. §1591(e)(2).
[5] 18 USC § 1591(e)(5).
[6] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[7] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

26. Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[8] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[9]

## FACTS

### I. Jane Doe (DJK) is a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed, and Controlled by Defendants.

27. Jane Doe (DJK) is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). Her trafficker used physical violence, psychological abuse and manipulation, a pattern of threatening and intimidating conduct, exploitation of financial dependence, extreme restrictions on Jane Doe (DJK) freedom, restraints on Jane Doe (DJK) freedom of movement, extreme isolation, and coercive control to require her to engage in commercial sex for his financial benefit, including at the Corona Motel 6.

28. Jane Doe (DJK) first came under the control of her trafficker in 2014. Her trafficker trafficked Jane Doe (DJK) and other victims. She remained under continuous control of her trafficker until at least 2018. Between 2014 and May 2015, this trafficker regularly and repeatedly trafficked Jane Doe (DJK) at the Corona Motel 6.

29. Jane Doe (DJK)'s father, who was the primary source of financial support for the family, passed away. Following his death, the family experienced significant financial hardship. In response, Jane Doe (DJK) answered a craigslist advertisement and was misled into what she

---

[8] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking

[9] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

believed was a legitimate job opportunity. Instead, she was coerced into sex trafficking. Upon meeting her trafficker online, he exploited her vulnerability, using false promises of a career and financial security to gain her trust and foster dependence. He then used that dependence, physical force and threats to her family to compel Jane Doe (DJK) to engage in commercial sex for his financial gain.

30. Throughout her trafficking period, Jane Doe (DJK)'s trafficker used various techniques to maintain control over her and to cause her to engage in commercial sex for his financial benefit.

- He often beat Jane Doe (DJK), leaving bruising and other visible injuries on her face and body.
- He assaulted Jane Doe (DJK).
- He expressly threatened violence against Jane Doe (DJK).
- He expressly threatened violence against Jane Doe (DJK)'s family.
- He made Jane Doe (DJK) financially dependent on him in order to gain control of her, and then threatened to cut off her support if she did not comply with his demands.
- The trafficker took all of Jane Doe (DJK)'s cash.
- The trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (DJK) to believe she would face serious harm or physical restraint if she did not comply with his ongoing demand that she engage in commercial sex for their financial benefit.
- The trafficker and his associates constantly monitored Jane Doe (DJK).
- The trafficker imposed strict rules on Jane Doe (DJK)'s behavior and restrictions on her movements.
- He forced Jane Doe (DJK) to engage in criminal behavior and then threatened her with punishment if she did not comply with his demands.

31. Jane Doe (DJK)'s trafficker required her to "earn" a certain amount of money each

day, but the trafficker collected the proceeds and limited or foreclosed Jane Doe (DJK)'s access to cash.

32. On information and belief, Jane Doe (DJK)'s trafficker operated mainly out of hotels, moving Jane Doe (DJK) and other victims around between his preferred hotels. Jane Doe (DJK)'s trafficker was intentional about the hotels where he operated. He had an established relationship with members of the hotel staff where he could operate without interference, thereby minimizing his risk of detection and traceability. For these reasons, the Corona Motel 6 was one of his preferred hotels.

33. Jane Doe (DJK)'s trafficker used the control he maintained through the above-described methods to require Jane Doe (DJK) to engage in commercial sex at the Corona Motel 6. Jane Doe (DJK) was repeatedly harbored, maintained, provided, solicited, and forced to engage in commercial sex at the Corona Motel 6.

34. During the period that she was trafficked at the Corona Motel 6, Jane Doe (DJK)'s trafficking had profound effects on her. These effects were obvious to the staff and management of the hotels where she was trafficked, including effects on Jane Doe (DJK)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. This manifested in signs of Jane Doe (DJK)'s trafficking that were obvious and apparent to the staff at the Corona Motel 6. These signs, as described below in more detail, included nervous and fearful demeanor, signs of paranoia, disorientation, refusal to make eye contact, limited access to clothing, inability to move around the hotel or communicate with others, submissive behavior with her trafficker, asking her trafficker for permission for basic things, letting her trafficker speak on her behalf, inability to provide logical responses to basic questions, providing obviously scripted responses when questioned, lack of personal possessions, signs of

sleep deprivation, poor hygiene, etc. These signs matched "red flags" of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hotel environment.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

35. The widely known and pervasive relationship between sex trafficking and the hotel industry cannot be disregarded and necessarily shapes what each Defendant knew or should have known regarding the trafficking at the Corona Motel 6, including the trafficking of Jane Doe (DJK).

36. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[10] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[11] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[12] Hotels have been found to account for over 90% of the commercial exploitation of children.[13]

37. Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts

---

[10] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[11] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[12] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[13] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[14]

38. These law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

39. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[15] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appear to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;

---

[14] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[15] *See id.*

- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

40. Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[16] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

[16] *See id.*

- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

41. Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[17] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;

[17] *See id.*

- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

42. The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [18]

43. Before Jane Doe (DJK)'s trafficking at the Corona Motel 6, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in the hotel.

44. It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

45. There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[19] As a result, these women are victims of sex trafficking. Most federal sex trafficking

[18] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

[19] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[20] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[21]

46. State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[22]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[23]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[24]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[25]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal

---

[20] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[21] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustrMCG/hotelmotel.

[22]United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[23] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[24]https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[25] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

> courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[26]

47. When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

48. Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of Jane Doe (DJK)'s trafficking, each Defendant knew and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

49. Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

50. The most effective weapon against sexual exploitation and human trafficking is education and training.[27] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from

[26] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

[27] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

> budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[28]

51. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[29] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

52. Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

53. The G6 Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like Jane Doe (DJK).

**III. Sex Trafficking at G6 Branded Hotels was well Known by G6.**

54. G6's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Jane Doe (DJK)'s trafficking that sex trafficking was ongoing and widespread at G6 properties.

---

[28] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[29] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

55. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[30]

56. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles.[31] From this lawsuit, G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

57. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking.[32] Based on information and belief, G6 has failed to adequately implement and enforce such changes.

58. G6 intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[33]

59. Public statements of the G6 Defendants confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[34] They also acknowledged the

---

[30] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility.

[31] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[32] *Id.*

[33] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).

[34] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[35]

60. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[36]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[37]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[38]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[39]
- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[40]
- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[41]

---

[35] *Id.*
[36] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.
[37] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.
[38] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html
[39] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.
[40] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html.
[41] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

- In July 2012, a man was accused of trafficking young girls in foster care for sex. The girls often met customers at a Studio 6 in Jacksonville, Florida.[42]

- In August 2012 a person was charged with prostitution at a Studio 6 in Mentor, Ohio.[43]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[44]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[45]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[46]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[47]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[48]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[49]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[50]

---

[42] *Feds: Man recruited foster care girls for prostitution*, News4Jax (July 6, 2012), https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution/.
[43] Mentor Police: Prostitute Ran Massage Parlor at Hotel, Fox8 (Aug. 3, 2012), https://fox8.com/news/mentor-police-say-prostitute-ran-make-shift-massage-parlor-at-hotel/.
[44] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.
[45] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.
[46] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.
[47] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[48] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.
[49] Man, 25, Is Accused Of Trafficking Teens, Twin CitMCG Pioneer Press (Jun. 5, 2014), https://www.twincitMCG.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/
[50] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[51]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[52]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[53]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[54]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[55]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[56]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[57]

---

[51] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.
[52] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.
[53] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.
[54] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.
[55] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.
[56] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.
[57] Amanda Milkovits, Massachusetts Man Accused Of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[58]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[59]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[60]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[61]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[62]

61. These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at G6 branded hotels. Moreover, on information and belief, the G6 Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 branded properties.

---

[58] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[59] Hsing Tseng, Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[60] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleadsguilty/89566374/. https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[61] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[62] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/. https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

62. Reviews of G6 branded properties, which upon information and belief, each of G6, monitored regularly, also show both the pervasiveness of sex trafficking at G6 properties and G6's knowledge of the same. For example:

- A 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[63]

- A 2011 Yelp review in California states "…We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[64]

- A 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[65]

- A 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[66]

- A 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on

[63] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html
[64] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa
[65] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html
[66] https://www.yelp.com/biz/motel-6-salinas

several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[67]

- A 2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[68]

- A 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[69]

- A 2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[70]

- A 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[71]

- A 2013 TripAdvisor review from Tennessee states "Two different rooms within sight of my room had prostitutes working out of them, one with an amazingly loud

[67] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html
[68] https://www.yelp.com/biz/motel-6-dallas-4
[69] https://www.yelp.com/biz/motel-6-escondido?start=60
[70] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html
[71] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html

and foul-mouthed guy. I was tailed by a drug dealer who seemed to be concerned that I was competition and once he determined that I wasn't, he disappeared. There are obviously semi-permanent residents there. . . . To the management who will undoubtedly respond to this review with some sort of vague platitudes about being happy to hear comments from their guests: Save your typing fingers. It's pretty clear that you INTEND to operate your property like this. Your property is unsafe, unsanitary, and you are doing NOTHING to prevent it."[72]

- A 2013 Yelp review from California states: "If you want drugs, hookers, tweekers, dope heads, and shitty service this is your place. I wish the police would shut this place down. This is a great neighborhood but this place draws the worst people I have ever seen. I don't get how the police havent shut this place down. Police should be warned and concerned about this horrible establishment!!! do not bother with this horrid location."[73]

- A 2013 TripAdvisor review from Illinois states: "I have recently been relocated with my job out here so looking for a place in glenview area.I stood here for a week.They had pimps and prostitution going on next door,under and across from me my whole week hear.I told front desk of the noise and loud banging they were making all day and night long.The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me.Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers.The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her.It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out.Also they were also throwing rocks late night at my windows.This place is more like a homeless shelter but you pay for it!!! They have cams in the hallways but obviously they dont watch them or they dont work or care!!!! Stay away if you are smart!!!!"[74]

- A 2014 Expedia review from Texas states: "We only stayed one of two nights since I refused to stay another night with my daughter in what seemed like a brothel. For starters, there are some very sleazy low lifes that stand by the side doors making it very intimidating to enter. They would let in scantily clad women wearing wigs and other sleazy looking people who I assumed were the "johns". I also saw what looked like drug deals taking place. When I would use the side door, there was always some guy that would try to get in although it was obvious they weren't staying there."[75]

---

[72] https://www.tripadvisor.com/Hotel_Review-g55229-d98206-Reviews-Motel_6_Nashville-Nashville_Davidson_County_Tennessee.html
[73] https://www.yelp.com/biz/motel-6-sacramento-sacramento
[74] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html
[75] https://www.expedia.com/Dallas-Hotels-Motel-6-Dallas.h73785.Hotel-Reviews

- A 2014 TripAdvisor review from Louisiana states: "had $500 stolen from my room, elevator stunk of marijuana and my friend was offered a prostitute by what must have been an organised ring at the hotel that the staff were happily working with! No refund offered when I was there even when I E-mailed the Motel 6 when I got home they obviously didnt care as they never got back to me, just awful"[76]

- A 2014 review from Georgia states: "I don't know why Motel 6 management has allowed this one to be taken over by creeps, but it has. This place will not give you a good night sleep with the all night drug deals and hookers yelling, slamming doors, and dogs barking (yes, dogs barking!). ...Seriously, it ain't safe and it needs to be shut down by the city. DON'T GO HERE!!!!!"[77]

63. These reviews are limited representative examples. There are many similar online reviews for G6 branded hotels, and, on information and belief.

64. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (DJK) was trafficked at the Corona Motel 6, G6 knew or should have known:

a. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

c. G6 hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

65. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning

---

[76] https://www.tripadvisor.com/Hotel_Review-g60864-d1203913-Reviews-Siegel_Select_New_Orleans-New_Orleans_Louisiana.html
[77] https://www.tripadvisor.com/Hotel_Review-g35322-d86893-Reviews-Motel_6_Atlanta_Tucker_Northeast-Tucker_Georgia.html

revenue and profits from renting out space in their hotels as a venue for trafficking.

**IV. G6 had actual and constructive knowledge of widespread and ongoing sex trafficking at the Corona Motel 6.**

66. At all relevant times, G6 also knew or should have known that sex trafficking was prevalent at the Corona Motel 6 specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that G6 knew and acknowledged to be indicators of sex trafficking in a hotel environment.

67. G6 knew that the Corona Motel 6 was in a high-crime area with a high incidence of sex trafficking and related criminal activity. Before, during, and after the time that Jane Doe (DJK) was trafficked at the Corona Motel 6, law enforcement records indicate obvious and apparent criminal activity on the property.

68. Online reviews and articles confirm the presence of criminal activity associated with sex trafficking at the Corona Motel 6:

- A 2014 Yelp review states, "One word. Horrible. Security guy is scared it seems to do anything about problem people here. Lots of people just wandering around, "couples" fighting and the staff here couldn't care less. Did I mention that police visits seem to be a nightly routine. Very dangerous place to stay especially with my daughter. I will never come back. I strongly urge others to at least check it out from yourself before you check in. I am posting this not to create problems for this business but because someone could get hurt or stolen from by staying here. I also called the police once to have then come out after a three hour fight and they said this place was known for prostitution, drugs, and other problems"

- A 2016 Trip Advisor review states, "Motel 6 in Corona CA is not a place for families, business persons or someone on a vacation. My experience there was terrible there are so many shady characters staying or should I say living there. There was so much illegal activity going on there with people who seemed staying there long term. All night long cars coming and going. On my last night I was coming back from walking my dog when we turned the corner to return to our room and there were police at a room just a few doors down with their guns drawn banging on the order yelling commands. I hustled to my room got in and waited a few seconds to look out window. When I looked out they had a female up against a parked car in lot handcuffing here and add one men sitting on the ground handcuffed. This was not a movie this happened at MOTEL 6 in Corona, CA so my

stay was unpleasant. Oh I didn't tell you about the bf and gf yelling and bf beating on gf in parking lot in a.m. of same day."

- A 2017 Yelp review states, "U SUCK MOTEL 6 CORONA... GHETTO PIMPS,,! DRUGS & DISEASE..! I'd give a negative ZERO if it were an option. Disgusting, WORST motel stay I've ever experienced in my life. GOD AWFUL!!! I ordered a non smoking room, first thing I was hit with was the stench of a cigarette from someone earlier in the day, then the beds were an absolute horror as if 1000's of whores turned trix in them. I was frightened to even try and sleep on them. Then all night long there were a few gang banging vato's a few doors away, up late drinking and doing drugs keeping me awake. It was late and I was too weary to put up a fight, thankfully I brought ear plugs. Seems like it is the local spot for tweaking meth heads. I would have let it go being that Motel 6 is the bottom of the barrel flea bag business that it is but what drove me over the edge was that there was "NO FREAKING HOT WATER" to take a shower in the morning, What a NIGHTMARE. I'm so angry. Stay clear of this dump! Drug haven for the low income, socially deranged abusers and filthy prostitute palace. Never again motel 6.

- A 2018 Yelp review states, "Stayed at Motel 6 in Corona approximately 4 months ago. Went to check in today for one night, they told me I am a no rent. I was told that because after I checked in I went to work my nephew stayed in the room which I had informed the front desk of when I checked in they said that was okay, and I am a no rent? I'm a senior citizen, what kind of trouble did I cause? There's all kinds of crackheads that stay there, hookers, and I've seen people selling dope out of the hotel rooms, and I am a no rent? Places is a filthy dump the only reason I wanted to stay there is because it's pet friendly. Don't waste your money or your time."

69. Based on these hotel reviews, the hotel staff at the Corona Motel 6, on information and belief, reacted with indifference to guest reports about the signs of criminal activity, thereby facilitating criminal activity at the hotel.

70. On information and belief, Jane Doe (DJK)'s trafficker repeatedly chose to use the Corona Motel 6 for his sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. The trafficker operated with minimal expenditure of time and resources on concealment due to an implicit understanding with the Corona Motel 6 that he could operate without risk of disruption.

71. Based on news stories, hotel reviews, guest complaints and records of law-enforcement calls, there were multiple victims trafficked at the Corona Motel 6 before and during Jane Doe (DJK)'s trafficking. On information and belief, this trafficker followed a repetitive and routine procedure during stays at the Corona Motel 6 and there were "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

72. All knowledge from the staff at the Corona Motel 6 is imputed to G6. Accordingly, G6 knew or should have known about the sex trafficking at the Corona Motel 6 based on the direct observations of hotel staff, including management-level staff.

73. G6 also knew or should have known about the sex trafficking at the Corona Motel 6 based on:

a. surveillance of the property;

b. internal investigations;

c. customer complaints;

d. monitoring of customer feedback;

e. information received from law enforcement;

f. and other sources of non-public information available to G6 Defendants.

74. G6 required hotel staff to report suspected criminal activity at the Corona Motel 6, including sex trafficking, to G6.

75. Based on the obvious signs of sex trafficking at the Corona Motel 6, the staff was required to, and upon information and belief did, report numerous instances of suspected sex trafficking to G6.

76. G6 also knew or should have known about the trafficking at the Corona Motel 6 based on:

a. The obligation of hotel staff to report suspected criminal activity, including sex trafficking, to G6;

b. G6's regular monitoring of online reviews;

c. G6's collection and monitoring of customer surveys and complaints;

d. G6's requirement that the staff submit regular and detailed reports to G6 about day-to-day hotel operations;

e. G6's collection and monitoring of data about guests at the Corona Motel 6, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. G6's supervision and control over day-to-day operations of the Corona Motel 6 through detailed information and extensive reports that it obtained through the property management system and other software systems it used;

g. G6's regular inspections of the Corona Motel 6;

h. G6's employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. G6's access to surveillance and security systems;

j. Information provided to G6 by law enforcement; and

k. Other sources of information available to G6.

77. G6 observed obvious "red flags" of numerous instances of sex trafficking occurring at the Corona Motel 6 based on their supervision and monitoring of the property. As a result, G6 knew or should have known that the Corona Motel 6 was facilitating widespread sex trafficking.

## V. Defendants knew Jane Doe (DJK) was being trafficked at the Corona Motel 6 because of the apparent and obvious "red flags" of sex trafficking.

78. During the period that Jane Doe (DJK) was trafficked at the Corona Motel 6, there were numerous and obvious signs that her trafficker was engaged in sex trafficking, including but

not limited to:

- Jane Doe (DJK) arrived with few or no personal belongings. She appeared nervous, scared, and avoided eye contact.
- Jane Doe (DJK) exhibited signs of malnourishment, poor hygiene, fatigue, and physical abuse—conditions that would have been visible to hotel staff.
- The hotel rooms used for Jane Doe (DJK)'s trafficking were paid for in cash or prepaid credit cards.
- Multiple rooms were rented simultaneously by Jane Doe (DJK) or her trafficker.
- Jane Doe (DJK) rarely, if ever, left the room. If she did, it would've been at odd hours, and she showed clear signs of restricted freedom of movement.
- There was a high volume of foot traffic to and from Jane Doe (DJK)'s room, involving men who were not registered hotel guests—activity that was visible and obvious to hotel staff.
- A constant flow of men entered and exited Jane Doe (DJK)'s room at all hours. The number of individuals present in the room was excessive and would have been noticed by hotel staff.
- Rooms were rented for irregular durations, including hourly, less than a day, or extended stays that did not align with typical guest behavior.
- The "Do Not Disturb" sign was frequently displayed during Jane Doe (DJK)'s stay and would be up for days at a time.
- Housekeeping services were constantly refused. Jane Doe (DJK) would not allow staff into the room but requested additional towels and linens.
- Large amounts of cash were visibly present in the room.
- Upon guest departure, housekeeping staff would have detected strong odors of musk and body fluids in the room
- After Jane Doe (DJK)'s checkout, housekeeping staff would have noticed the presence of sexual paraphernalia including condoms and lubricants.
- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

79. Employees at the Corona Motel 6, including management-level employees, observed or were made aware of these obvious signs of Jane Doe (DJK)'s trafficking while acting within the scope and course of their employment.

80. As such, G6 knew or should have known that Jane Doe (DJK) was being trafficked at the Corona Motel 6.

81. Given these obvious signs, G6 knew or should have known about the trafficking activity that resulted in the trafficking of Jane Doe (DJK) pursuant to their policy or protocol under which hotel staff were required to, and upon information and belief, did report suspected sex trafficking to G6.

82. G6 also knew or should have known about the trafficking of Jane Doe (DJK) based on the numerous tools, described above, through which they monitored and supervised the Corona Motel 6.

83. G6 also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (DJK) at the Corona Motel 6 because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If G6 had exercised ordinary prudence in areas of operations over which they had direct control and in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Jane Doe (DJK)'s trafficker at the Corona Motel 6:

a. G6 was directly involved in training and education of hotel staff regarding the detection of sex trafficking. If they had exercised ordinary prudence in creating, providing, and enforcing this training, then the activities of Jane Doe (DJK)'s trafficker would have been detected.

b. G6 was responsible for the development, implementation, and enforcement of policies, procedures, and practices regarding the detection of and response to suspected sex trafficking at the Corona Motel 6. If they had exercised ordinary prudence in adopting, implementing, and enforcing policies and protocols, then the activities of Jane Doe (DJK)'s trafficker would have been detected.

c. G6 was responsible for the rental of rooms at the Corona Motel 6. If they had exercised ordinary prudence as to the development, implementation, and enforcement of policies, procedures, and practices regarding standardized check-in protocol, payment methods, identification requirements, obtaining vehicle information, and monitoring visitors who are not registered hotel guests, then the activities of Jane Doe (DJK)'s trafficker would have been detected.

d. G6 was responsible for the collection, tracking and analysis of guest data, property data, Wi-Fi data, and security data and retained sole ownership of all guest data. This data revealed "red flags" of sex trafficking. If G6 had exercised ordinary prudence as to the monitoring and analysis of this data, the activities of Jane Doe (DJK)'s trafficker would have been detected.

## VI. Defendants actively facilitated sex trafficking at the Corona Motel 6, including the trafficking of Jane Doe (DJK).

84. G6 harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (DJK) at the Corona Motel 6 when they continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the Corona Motel 6.

85. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Corona Motel 6, G6 continued renting rooms to be used in sex trafficking, providing traffickers with a safe haven, and operating the Corona Motel 6 in a way that enabled and facilitated sex trafficking activity.

86. Although G6 knew or should have known about the activity that resulted in Jane Doe (DJK) being trafficked, G6 continued to rent hotel rooms for and to facilitate that trafficking activity.

87. G6 facilitated widespread trafficking at the Corona Motel 6, including the trafficking of Jane Doe (DJK), in ways including, on information and belief:

a. developing relationships with traffickers, including Jane Doe (DJK)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (DJK) and other victims;

c. accommodating specific requests made by traffickers;

d. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for johns but also minimizing risks of detection;

e. serving as lookouts for traffickers;

f. leaving doors unlocked or ajar for the benefit of the traffickers;

g. providing traffickers with master keys or keys to external building doors;

h. accepting bribes from the traffickers;

i. allowing traffickers to check in without showing identification;

j. observing Jane Doe (DJK) in obvious distress but continuing to provide support to her trafficker;

k. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

l. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

m. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

n. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

o. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

88. G6's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking

victims, including Jane Doe (DJK).

89. G6 knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

90. The conduct of G6 in operating the Corona Motel 6 facilitated widespread sex trafficking at the hotels, including the trafficking activities of Jane Doe (DJK)'s trafficker. The specific ways that G6 facilitated sex trafficking at the Corona Motel 6 —including but not limited to their policies and practices that allowed for non-traceable payment methods, their policies and practices that allowed traffickers to rent rooms without providing their true identities, and their inadequate and inappropriate efforts at detection of and response to signs of sex trafficking— directly assisted and facilitated the activities of Jane Doe (DJK)'s trafficker at this hotel and the trafficking of Jane Doe (DJK).

91. Jane Doe (DJK)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Corona Motel 6 over an extended period because G6 adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

92. G6 knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## VII. G6 Defendants' Venture at the Corona Motel 6

93. G6 benefited from use of the Corona Motel 6 in connection with sex trafficking. Jane Doe (DJK)'s trafficker rented rooms at the Corona Motel 6 and used the premises to harbor,

maintain, and provide victims for commercial sex acts, including Jane Doe (DJK). When this trafficker rented rooms, G6 Defendants received a financial benefit.

94. G6 generated revenue every time a sex trafficker rented a room at the Corona Motel 6, both from room rental fees and from fees for other hotel services.

95. Each of the G6 Defendants generated substantial income from direct operations of hotels such as the Corona Motel 6. In exchange for providing the services described above, each of G6 Defendant received a share of the revenue from room rentals collected at the Corona Motel 6. The fees generated by G6 are primarily based on gross room rentals; therefore, G6's revenue increased with each room rental at the Corona Motel 6. Revenue generated from rooms rented at the Corona Motel 6 was distributed among the G6 Defendants, with each benefiting from each rental of a hotel room.

96. G6 also benefited from sex traffickers' frequent use of the Corona Motel 6 because this regular and routine use of the hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for G6 including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

97. As more fully described above, G6 knowingly benefited from participating in a venture with sex traffickers who regularly operated at the Corona Motel 6, including Jane Doe (DJK)'s trafficker.

98. The G6 Defendants participated in the venture through a continuous business relationship with sex traffickers. The traffickers developed a continuous business relationship with the Corona Motel 6 and participated in this ongoing business relationship through their role at the Corona Motel 6 hotel operations. This continuous business relationship involved mutual pursuit of benefit. The G6 Defendants generated revenue from renting the rooms to traffickers who, in

turn, used the rooms to generate revenue from the illegal sex trafficking operation. This continuous business relationship developed as:

a. On information and belief, hotel staff developed familiar relationships with the traffickers.

b. G6 facilitated and enabled sex trafficking in the ways described above in Sections V-VI.

c. The G6 Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties.

d. The traffickers developed an understanding that hotel policies and practices would minimize their risk of detection and traceability.

e. The traffickers developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoid interference by hotel staff.

f. The traffickers repeatedly returned to this same hotel because of an understanding that it was a venue that would enable and facilitate their sex trafficking operation.

99. This continuous business relationship facilitated, assisted, and supported the traffickers' illegal sex trafficking activities, including the trafficking of Jane Doe (DJK). G6 and The G6 Defendants did not only provide the traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by hotel staff and with minimal risk of detection and traceability. On information and belief, G6 also allowed johns who were not registered hotel guests to come and go freely without any need to identify themselves within the Corona Motel 6. This helped the traffickers to attract business from sex buyers and to minimize risks of detection and traceability. The conduct of G6 facilitated trafficking at the Corona Motel 6.

100. G6 knew or should have known that the venture with the traffickers was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and

exploited at the Corona Motel 6 by traffickers including Jane Doe (DJK)'s trafficker.

101. G6 knew or should have known that there were TVPRA violations within the scope of this venture based on the obvious "red flags" associated with the trafficking activities of Jane Doe (DJK)'s trafficker and other traffickers at the Corona Motel 6.

**VIII. The G6 Defendants are jointly responsible for the trafficking of Jane Doe (DJK).**

102. Upon information and belief, each of the G6 Defendants, all of whom are corporate affiliates subject to common ownership and control, participated in a joint venture or integrated enterprise with one another regarding the operation and control of the Corona Motel 6. This involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management. They shared office space, employees, management, and policies. Thus, the G6 Defendants are vicariously liable for the actions of one another regarding the operation, franchising, and control of the Corona Motel 6.

103. Upon information and belief, the operation of the Corona Motel 6 was part of a single unified operation by the G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the Corona Motel 6. As an integrated enterprise and/or joint venture, the G6 Defendants were separately and jointly responsible for compliance with all applicable laws.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

104. Jane Doe (DJK) incorporates all other allegations.

**I. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

105. Jane Doe (DJK) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

106. The G6 Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. knew about or were willfully blind to the activity leading to Jane Doe (DJK)'s trafficking because they directly observed the obvious "red flags" of this trafficking activity;

b. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Jane Doe (DJK), knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

c. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including Jane Doe (DJK).

## II. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (All Defendants).

107. Jane Doe (DJK) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. Jane Doe (DJK) is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

108. All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

109. Through acts and omissions more fully described throughout this Original Complaint, G6 and received a financial benefit from participating in a venture with Jane Doe (DJK)'s sex trafficker and other traffickers who regularly operated at the Corona Motel 6.

a. This venture resulted from the development of a continuous business relationship between these traffickers and the Corona Motel 6, which formed when G6 and continued renting these traffickers hotel rooms despite the obvious "red flags" of their sex trafficking activity and created an environment at the Corona Motel 6 that facilitated their trafficking activities.

b. G6 directly participated in this ongoing business relationship through their respective roles in hotel operations—and specifically those aspects of operations that facilitated sex trafficking—as described above. Through their participation, G6 facilitated and supported the activities of the sex trafficking of Jane Doe (DJK) and other traffickers at the Corona Motel 6.

c. G6 benefited from participation in this venture because they received increased revenue and other benefits described above when rooms at the Corona Motel 6 were rented to traffickers, including Jane Doe (DJK)'s trafficker.

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including Jane Doe (DJK), at the Corona Motel 6.

e. G6 knew or should have known that this venture was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of Jane Doe (DJK)'s trafficker and other traffickers regularly operating at the Corona Motel 6 and because this trafficking would have been detected if they had exercised ordinary prudence.

## III. Cause of Action: Vicarious Liability for TVPRA Violations (G6).

110. Jane Doe (DJK) further alleges that the G6 Defendants are vicariously liable for the acts and omissions of the staff at the Corona Motel 6 as a direct employer. In the ways described throughout this Plaintiff's Original Complaint, G6 controlled the terms and conditions of their employment.

111. Moreover, each of the G6 Defendants is liable for the acts and omissions of the other G6 Defendants with respect to the operation of the Corona Motel 6. On information and

belief, G6, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Corona Motel 6. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Corona Motel 6, making them vicariously liable for one another.

## TOLLING OF LIMITATIONS

112. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (DJK) invokes the discovery rule. At the time she was harmed and through at least 2018 (and May 2015 at the Corona G6), Jane Doe (DJK) was under the coercion and control of a trafficker who beat her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Jane Doe (DJK) lacked the information and capacity to understand her injuries and their legal causes.

113. Thus, Jane Doe (DJK) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (DJK)—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (DJK) being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

114. At the time Jane Doe (DJK) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

115. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (DJK) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (DJK) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (DJK) filed this lawsuit.

116. While under the control of her trafficker through at least 2018, Jane Doe (DJK) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (DJK) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

117. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (DJK) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, at the Corona Motel 6.

118. Jane Doe (DJK) was subject to continuous trafficking at the Corona Motel 6 through at least May 2015, which is not more than 10 years before Jane Doe (DJK) filed this lawsuit.

119. This continuous trafficking resulted from G6 Defendants' facilitation of trafficking at the Corona Motel 6 and G6 Defendants' ongoing ventures with one another and with criminal traffickers at this hotel.

## **DAMAGES**

120. Jane Doe (DJK) sustained legal damages as a result of being the victim of sex trafficking under the TVPRA.

121. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (DJK).

122. Jane Doe (DJK) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future)

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Necessary medical expenses (until trial and in the future);

e. Life care expenses (until trial and in the future);

f. Physical pain and suffering (until trial and in the future);

g. Physical impairment (until trial and in the future);

h. Emotional impairment (until trial and in the future);

i. Exemplary/Punitive damages;

j. Attorneys' fees; and

k. Costs of this action.

l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

123. Jane Doe (DJK) demands a jury trial on all issues.

## RELIEF SOUGHT

124. WHEREFORE, Jane Doe (DJK) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (DJK) against all the G6 Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (DJK) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

FIBICH LEEBRON
COPELAND BRIGGS

By: *_/s/ Kenneth T. Fibich_*

Kenneth T. Fibich
Texas Bar No. 06952600
tfibich@fibichlaw.com
Sara J. Fendia
Texas Bar No. 06898800
sfendia@fibichlaw.com
1150 Bissonnet Street
Houston, Texas 77005
713-751-0025 (Telephone)
713-751-0030 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**